In the Matter of the Estate of MARY C. DE BRABANT, Deceased.

Surrogate's Court, New York County, December 7, 1949.

*Edward E. Hoenig* for City Bank Farmers Trust Company, as sole surviving executor of Mary C. de Brabant, deceased, petitioner.

*Garvan & Corbett* for Arthur Adlington, respondent.

*William G. McKnight, Jr.,* for American Students Social Center, Inc., respondent.

*Rodrique Bertol* for Octavia Roy, respondent.

COLLINS, S. The issue here is the enforcibility of a $25,000 claim against the estate of Mary Clark de Brabant, asserted by The American Students' Social Center, Inc.

The claimant maintains that the $25,000 represents the third and final installment due under two subscription agreements by the decedent, dated November 1, 1928, and February 19, 1935, respectively, which pledge a total of $75,000 toward the erection

of a chapel, as part of a building project enlarging the non-sectarian social and religious activities of the claimant for the benefit of American students and artists in Paris, France.

Most of the salient facts are in writing, and therefore, not enmeshed in conflict or complication. Neither is there disagreement over the governing law. Rather, the contest stems from disagreement regarding the application of settled law to uncontradicted facts.

That the decedent pledged $75,000 to the project, and that $50,000 thereof was paid before her death; that she never repudiated the obligation to pay the remaining $25,000 but, instead, repeatedly acknowledged the obligation and unmistakably expressed her intention to pay, but that death intervened before payment; that part of the program has been achieved on leased instead of purchased land; and that, because the $25,000 has not been paid, the chapel has not yet been erected, but that preliminary work thereon (including the laying of the cornerstone) has been done — these are indisputable facts.

Mrs. de Brabant died on December 19, 1939. The proof of debt was filed on January 20, 1941, and rejected by the executors on January 27, 1941. In December, 1948, the sole surviving executor filed its final accounting, and on February 25, 1949, the claimant filed its objection thereto by reason of the rejection of its claim for $25,000. From such rejection a trial of the issue ensued.

The surviving executor advances six grounds for disallowance of the claim: (1) That the agreement of November 1, 1928, was so indefinite and uncertain as to make it unenforcible. (2) That recovery is barred by the six-year Statute of Limitations. (3) That the agreement of February 19, 1935, lacks consideration. (4) That the claimant is not the real party in interest, because the subscription agreements were made with the American Episcopal Church of the Holy Trinity, and not with the claimant; that the decedent never consented to an assignment to the claimant, and that the latter did not assume the obligations of the former under the agreements. (5) That the failure to erect the chapel within a reasonable time constitutes failure of consideration. And, finally, (6) that leasing the land upon which the chapel was to be erected, instead of purchasing it outright, amounts to a frustration of the purpose for which the subscription was originally made; and, moreover, that the evidence establishes the misrepresentation of a material fact indicating inability to create the memorial contemplated.

Inasmuch as the background of the claim, and its setting, form integral segments of the picture, they must be considered in determining the issue.

In 1890, Dr. John N. Morgan, Rector of the American Episcopal Church of the Holy Trinity in Paris, " organized an American students' work on the Left Bank of Paris ", assisted by Mrs. Whitelaw Reid, the wife of the then United States Minister to France. Included was a small chapel called the St. Luke's Chapel, but called by the students " The Little Tin Church ". The chapel was on property surrounded by buildings in which American women students lived; these buildings were owned and equipped by Mrs. Reid. Dr. Morgan died in 1912. Dr. Frederick W. Beekman, a former lawyer, and ordained Episcopal minister, of Boston, went to Paris as an army chaplain in 1917 and in 1918 became acting rector of the church. When the church became the American Pro-Cathedral Church of the Holy Trinity, Dr. Beekman was made its dean and still occupies that position. He was the only witness who testified at the trial on the fundamental issue here presented.

The great influx of American students and artists in Paris following the first world war induced the church to project a campaign for raising funds to enlarge the property which had been used up to that time as a social and religious student center.

Pursuant to the plans, the church's representative, Dean Beekman and his wife, came to New York in 1928 and called upon certain wealthy friends of the church, including the decedent, a daughter of the late Senator Clark of Montana. Dean Beekman and the decedent were old friends — their friendship was on a first-name basis. The decedent had spent much time in Paris, where she was a regular attendant at services in Dean Beekman's church. At the decedent's invitation, Dean Beekman and his wife called on the decedent at her Long Island home, when the architectural plans for the enlargement of the facilities for American students were outlined in a general way. Tentative plans, specifications and drawings for the erection of the chapel and other buildings had been prepared by the architect prior to Dean Beekman's trip to New York.

Dean Beekman testified that " almost at once " the decedent said: " ' I am greatly interested and I am going to help you.' And I said, ' Well, anything special? ' She said, ' Yes. I would like to support the religious work of the center, centering in the chapel.' I said, ' Fine.' And she said of her own accord, ' I'll give you the chapel. What will it cost, do you think? '

I said, ' Well, the architects say it will cost somewhere between $50,000. and $75,000. My own judgment is that it will cost less than $75,000. at present prices '. She said, ' Well, I'll give the chapel and I would like to give it alone.' I said, ' Do you mean the interior, the altar, the reredos, the pulpit and the organ? ' ' Well ' she said, ' No, I think perhaps others can give that but I would like to give the chapel myself and perhaps name it as a memorial.' ''

Following this conversation, Dean Beekman prepared and the decedent signed the first pledge, reading:

'' Nov. 1, 1928

Dear Dean Beekman:

I hereby pledge myself, my heirs and my executors to give as a part of the new property to be erected for Student Work in Paris, France, by the American Episcopal Church of the Holy Trinity the Chapel, at an estimated cost of fifty thousand or at most sixty thousand dollars.

I will send you for this purpose during January, 1929 twenty five thousand dollars and within the following two years an equal amount or more if needed.

This subscription is given in consideration of other gifts which have and which will be given for the carrying out of the above named plans for Student Work and its equipment.

Yours very truly,

M. Clark de Brabant.''

Thereafter, decedent paid $25,000 on July 22, 1929, and another $25,000 on February 7, 1930, which sums were deposited with J. P. Morgan & Company in New York City, in the name of The Church of the Holy Trinity, invested in government bonds paying interest at approximately $1,500 a year, and transferred to the claimant when it was organized as a Delaware nonstock, nonprofit corporation on April 30, 1931. The incorporation was not only organized by the church to carry on the work theretofore accomplished by the church in behalf of the American Students' Social Center, but it was, and is, controlled by the church. Since its inception Dean Beekman has been the nonsalaried president of the corporation.

Subsequently, committees were formed and funds raised for the buildings other than the chapel, which was noted in the prospectus distributed by the committee six or seven months after the decedent's pledge of November 1, 1928, as '' given by a generous American woman who spends much time in France.''

The prospectus, prepared with the aid of the architects, contained sketches and was mailed to the decedent. It declared it was "printed in the interest of the campaign to buy the site and to build thereon the new American Students' Social Center, including St. Luke's Chapel and Clergy House, in the Latin Quarter to serve and aid the thousands of American Students there resident." (The term "buy" is now stressed by the executor as opposed to "lease".)

The campaign resulted in subscriptions aggregating approximately $400,000 including the $50,000 paid by decedent. However, no funds were solicited from other persons for the chapel and no other funds were allocated to the cost of erecting the chapel. But funds were solicited and obtained from persons other than the decedent for furnishing the chapel. Originally, the solicitation was by the Vestry of Holy Trinity until the incorporation of the claimant.

After planning and negotiations, a sixty-year lease was obtained on land which formed a part of the old Chateaubriand estate, owned by the Roman Catholic Church. "It took about two years" to secure the land. Dean Beekman testified that he never advised the decedent that the land was to be purchased, and, moreover, that the prospectus mentioning purchase was not sent to her until many months after her initial pledge.

The main building or social service building was erected in 1933 and 1934, opened for students in the autumn of 1934, and dedicated by the American and British Ambassadors, the French Minister of Construction in the French Cabinet and the Rector of the Sorbonne in late 1934. A pamphlet describing the building was sent to the decedent. This pamphlet stated: "A new chapel, the gift of Mrs. Marius de Brabant, will be erected in the near future to the north of the Club building."

The chapel was not erected at the same time as the social service building because — so Dean Beekman testified: "All our energies were bent on building the main building, the social service building which had to be built there first and dedicated. We were under a certain obligation to the French Government. The Minister of National Education and Beaux Arts had endorsed our plan publicly and the main feature of that plan so far as the French were interested was the social service building and our board and our architects and we all felt we had to get that building up first and that the chapel would wait until after that building was up."

They had "the funds to build part of the chapel" but "our architect advised us that we didn't have money enough."

Those in charge of the project knew the decedent's "views as to the type of Chapel she wished and we couldn't build the type of Chapel she wished for $60,000. or $50,000." The decedent wanted, he testified, a "worthy chapel, a Gothic Chapel, a Churchly Chapel."

In the fall of 1934 "The Little Tin Church" was turned back to the Whitelaw Reid Foundation and later torn down. The equipment was removed and installed in the assembly hall of the social service building, and Sunday services continued in that building without interruption.

Late in 1934 or early in 1935, following the completion of the social service building, the specific lot of land north of the main building was "measured out, staked out and selected as the final site of the Chapel. The cornerstone was laid at a ceremony." Claimant paid for the cornerstone and for the labor involved, and Dean Beekman wrote the decedent on January 8, 1935, "you will be interested to know that the cornerstone of your Chapel is in place."

Between 1930 and 1935 Dean Beekman visited this country and spoke with the decedent concerning the chapel, and sometime before writing her on January 8, 1935, he advised her that the architects' original estimate of $75,000 "would probably have to be followed if she was to have the Chapel that she wanted." He had written her on September 14, 1934, that "the situation as to your Chapel is changed a bit" and reminded her that she had given "the chapel itself without the interior furnishings." He told her of inquiries by persons who had given the interior furnishings as to when the chapel would be erected, and stated, "I am wondering if there is any way in which you can send me the last third of your subscription." She replied on November 19, 1934, that it was impossible for her to do anything "about the final third of my chapel subscription at the present time", due to the poor copper market, which she deemed "temporary". She thought the then situation "unfavorable to building operations". She suggested: "A beginning could even be made of the chapel and continued as far as funds on hand last. But in such matters you will know best." Significantly, the expression "final third" is employed three times in this letter.

On January 8, 1935, Dean Beekman, after writing to the decedent of the placing of the cornerstone of the chapel, added: "I am afraid we cannot go ahead with the building as yet." He told her he appreciated her position "and would not do anything in the world to worry" her. He added: "But there is

one thing you might do to help me, viz.: to formally agree that while we are holding our student Services in the main building of the group we may use the income of your gift for up-keep and the expenses of maintaining Church Services there. I know you would never object, but it is better business if you were to make this formal.'' He enclosed, and the decedent signed, the second pledge, which reads as follows:

'' I hereby direct that the income already received and receivable on the fifty thousand dollars paid by me to the American Students' Social Center of Paris, France, (Inc.), toward the cost of erection of a Student Chapel may be used for the upkeep and maintenance of Church Services, temporarily being held in one of the halls of said Students' Social Center and until I shall make a third and final payment of twenty five thousand dollars to said Students' Social Center which I agree to do. Upon the receipt of this amount it is understood that the said chapel shall immediately be erected.

(Signed)   M. CLARK DE BRABANT

Witness: J. W. Moore Richardson

Dated: Feb. 19th, 1935.''

Pursuant to the above authorization, the income on the $50,000 was used in the manner stipulated. The income was accumulated only during the war years.

Due to the decedent's difficulty in writing — she had suffered an injury — most of the subsequent correspondence between the decedent and Dean Beekman was carried on by Mr. John William Moore Richardson, in behalf of the decedent. Mr. Richardson, who witnessed the second pledge, was the decedent's business adviser (and evidently a lawyer) whose authority in the premises is not challenged.

In a letter to the decedent on January 2, 1938, Dean Beekman told her of the difficulties he was experiencing in collecting some of the pledges, and of the objections those pledgors might urge. He wrote: '' From what we know, they will base their claim partly on the fact that your subscription is not completed. Of course, we shall say to them and to the Court — if it goes that far — that, as you told me, the balance of $25,000. still to be paid is perfectly good against your estate if anything happened to you before payment, but they may not be satisfied with this statement.'' He added: '' I would not do anything in this world as you know, to inconvenience you or worry you, but if you can make an immediate payment of $15,000, then our position would not be in jeopardy as I see it. I am sorry to

write this, as I have hoped to go home this month and run out to see you and talk to you about it (this is always more satisfactory), besides having the pleasure to see you again, but as a fine business woman, I know you will appreciate the situation and help us in this critical matter. Delay would simply play into the hands of opposing interests.''

To the request for part payment, Mr. Richardson replied on June 17, 1938: '' At the present time it is out of the question for Mrs. de Brabant to make a payment of $15,000. as suggested in your letter, on her pledge of $25,000. still to be paid by her to the American Students' Social Center of Paris toward the cost of erection of a Students' Chapel. You know, of course, that the American security markets have had a very severe decline, dividend and bond payments having been cut to an alarming degree. Mrs. de Brabant regrets this situation — as we all do — but cannot at the present time make any payment on her unpaid pledge of $25,000. Mrs. de Brabant will pay this amount at the earliest possible date, but when this will be is hard to say.''

On June 30, 1938, Dean Beekman again wrote to Mr. Richardson, urging a payment on account of the $25,000 to avert the possibility of excuses by other subscribers that '' we have not secured funds with which to complete the program as set forth in the campaign. So if Mrs. de Brabant can make even a smaller payment than the one suggested, I think it would be good evidence that Mrs. de Brabant's payments have not ceased, but are still going on.''

This appeal was answered by Mr. Richardson on July 8, 1938, that it was '' out of the question for Mrs. de Brabant to make a payment at the present time '' because the demands on her were '' very heavy '', but promised, '' as previously stated, she will pay the amount pledged as soon as possible.''

Concerned about the Statute of Limitations, Dean Beekman wrote to the decedent on October 25, 1938: '' Since returning home I have had a thought which I must, as President of the Corporation, write to you about. It is this: Under the law, no agreements in writing, like yours, could be held valid if more than six years has passed since it was signed, or a payment has been made. I am not quite sure when your last payment was made, but I wish very much — and I know you will also wish it — that you send me a payment on the subscription even if the amount be much smaller than you would wish. Won't you please do this as soon as possible?''

Answering, Mr. Richardson wrote on December 6, 1938: " In your letter you speak of agreements in writing not being valid if more than six years have passed since the signing of same. Under date of February 19, 1935 Mrs. de Brabant signed an agreement — a copy of which I enclose — and you can see we have a few years to go before the six year period is up. Mrs. de Brabant regrets very much that she cannot at the present time make the payment of $25,000. to clear up the matter — or that she cannot make a payment in a smaller amount. * * * As previously stated, Mrs. de Brabant will pay the amount pledged as soon as possible."

Evidently Dean Beekman was satisfied with Mr. Richardson's reassurance, for he wrote Mr. Richardson on December 19, 1938: " When I wrote my letter of the 25th October, I did not have the agreement before me and for the moment felt that the time was approaching its end under the statute of limitations. I am sure Mrs. de Brabant told you of a word we had when I spent a Sunday with her in September at Plaisance. She brought up the matter herself and said she hoped to make a payment in the near future, although it would be small. It was because of that conversation that I wrote her on the 25th October, and also, as I wrote before, it was partially motivated by the fact that we are in a contest with the executors of another subscriber and I felt that they might seek to show that we could expect nothing more from Mrs. de Brabant."

The final letter in evidence (during the invasion, the German Army controlled the church property and the church's records were thereby thrown into confusion) is from Dean Beekman to the decedent, and dated December 20, 1938. This letter stated: " You spoke to me in September of the amount of your original subscription which was $65,000. The one made in 1935 was for $75,000. and that came about, you remember, because we thought that amount would cover interest which you thought was properly due because of delayed payments and the greatly increased building costs in France and everywhere since payment was delayed. But I want you to know that if the second sum will unduly press you, that I am perfectly willing to revert to the original agreement, for I am more anxious that you are satisfied than anything else. * * * So please, dear May, write me frankly on this point."

There is no proof that the decedent did or said anything regarding Dean Beekman's suggestion of reverting " to the original agreement " if " the second sum " would " unduly

press '' her. No further payment was made. As noted, Mrs. de Brabant died on December 19, 1939, within a year after the last letter in evidence.

Dean Beekman testified that the claimant would proceed with the erection of the chapel just as soon as the $25,000 was paid.

The facts have been recited more elaborately than is customary because it seems to the court that the mere recital reveals the answers to the objections to the claim interposed by the executor.

It bears repeating that at no time did the decedent repudiate her pledges to contribute $75,000 for the chapel; at no time did she seek a release or reduction from the pledges; at no time did she suggest that the $50,000 or even $60,000 was sufficient for the sort of chapel she wanted and was willing to pay for. The record evinces that she understood and was in complete accord with the concept that $75,000 was required, and that she was willing, if not eager, to contribute that sum. '' She always held that view '', affirmed Dean Beekman.

The executor's statement that the decedent '' refused to comply '' with the '' numerous requests * * * for additional funds '', is not entirely accurate. True, because her funds were heavily invested in depreciated copper stocks, she expressed *inability* — but not *refusal* or *unwillingness* — to make further payment at the times ·demanded, but these expressions were coupled in virtually every instance with a recognition of her obligation and a promise to pay. Nor is the executor's assertion that the decedent '' evidently was disturbed by the failure to erect the chapel because on November 19, 1934, she wrote * * * ' a beginning could even be made of the chapel and continued as far as the funds would last ' '' a complete version of her attitude. This was just a suggestion, linked to her statement: '' But in such matters you will know best.'' The record indicates that the decedent was kept informed of the situation, that she understood the reasons for the delay, and that she acquiesced in the delay. In the very same letter she mentioned '' the present situation '' as being '' unfavorable to building operations ''.

The decedent's obligation and intention being thus clearly manifest, we are faced with the quandary whether fine distinctions should be woven to thwart them. Though the executor's resistance to the claim is understandable in the circumstances, nevertheless, the query here is whether technicalities should be strained and splintered to defeat the decedent's wishes. Certainly for the court to go out of its way to effect repudiation

of an obligation recognized by the decedent as subsisting, would not be in consonance with justice.

But let us examine the objections seriatim:

(1) The point that the November, 1928, agreement is unenforcible because of uncertainty and indefiniteness, lacks validity. The decedent agreed to give "the Chapel". When the agreements are read together, and the entire picture is viewed, the obligation to pay $75,000 is clear. The $60,000 was an estimate only, Dean Beekman's estimate, not the decedent's. Since the architect's original estimate was $75,000 it is just as reasonable to construe the phrase "or more if needed" as referring to an additional $25,000 as to an additional $10,000. Any doubt is resolved by the conversation which resulted in the first pledge, by considering the purpose of the pledge, and by subsequent acts and writings. The decedent's own interpretation of the amount she was obliged to pay, must be accorded paramount consideration. To her, the undertaking was certain and definite.

(2) The objection that the Statute of Limitations applies is likewise untenable. Both parties had the Statute of Limitations in mind, both were equally desirous of averting its force, both acted on the premise that the statute would not apply. The reading of the two pledges together, the payments on account, the repeated acknowledgments of the obligation (Civ. Prac. Act, § 59), the death of the decedent (Civ. Prac. Act, § 21), together with all the other facts and circumstances, expose the point as devoid of merit.

(3) In determining the existence of consideration for the 1935 subscription agreement, we commence with the doctrine that: " * * * the objection of a want of consideration for promises like the one before us has not always been regarded with favor; and judges, considering defences of that character as breaches of faith towards the public, and especially towards those engaged in the same enterprise, and an unwarrantable disappointment of the reasonable expectations of those interested, have been willing, nay apparently anxious, to discover a consideration which would uphold the undertaking as a valid contract; * * * " (*Barnes* v. *Perine*, 12 N. Y. 18, 24.)

In *Matter of First M. E. Church* v. *Estate of Howard* (133 Misc. 723, affd. 233 App. Div. 753), Surrogate SLATER stated at page 726: " The courts sustain subscriptions for some public object if any consideration can be found. The consideration need not be one beneficial to the subscriber. The feeling that a

deliberate promise ought to be enforced has led the courts to declare for fair dealing, honesty and equity."

Again, in *Matter of Lord* (175 Misc. 921) Surrogate WINGATE laid down these three bases, at p. 923: "With all elements of the critical transaction disclosed upon the record, recovery upon subscription agreements has become the rule rather than the exception. Analysis of these adjudications indicates the presence of three different *rationes decidendi* for the attainment of this result, the *first* being the spelling out of an ordinary bilateral contract; *second,* the completion of a contract which was initially unilateral; and *third,* the invocation of an approximation of the equitable doctrine of estoppel."

It seems to the court that all three of the above elements are present here.

The two agreements are so interlocked that they must be treated as one transaction. Consequently, if there was consideration for one, there was consideration for the other. They related to the same subject matter — the second merely reaffirmed the first. Even if treated separately, the court is satisfied that consideration for each was present. In these cases involving a voluntary promise on the part of the promisor, the question is whether or not the agreement "expressly, or impliedly, either imposes upon the promisee some obligation, which is assumed, or requests of the promisee the performance of services, which are to be performed upon the strength of the promise. If those conditions are met, then, within the rule of law, there is a consideration which will suffice to uphold the agreement, or the promise. * * * if money is promised to be paid upon the condition that the promisee will do some act, or perform certain services, then the latter, upon performance of the condition, may compel payment. Nor need a request to the promisee to perform the services be expressed in the instrument; it may be implied." (*Keuka College* v. *Ray,* 167 N. Y. 96, 99–100; *Barnes* v. *Perine, supra; Matter of Taylor,* 236 App. Div. 571; *Allegheny College* v. *National Chatauqua Co. Bank,* 246 N. Y. 369.)

Surely it was implied that the claimant was to conduct the fund-raising campaign, of which the decedent's pledge formed a part, and that it would forbear from soliciting funds for the chapel from other persons. Moreover, there was an implied promise by the claimant or its predecessor in interest to go forward with the project, of which the chapel was an integral part. As to the 1935 pledge, we have the implied counter-

promise of the claimant to apply the accumulated and current income to maintenance of church services (*Matter of Borden,* 41 N. Y. S. 2d 269), forbearance from soliciting other persons for contributions to the chapel, and actual forbearance from bringing suit on the 1928 pledge in reliance upon the 1935 pledge, as well as repeated promises to pay the remaining $25,000. Again, the decedent knew that, in reliance on her pledges, expenses had been incurred in the employment of architects, the preparation of the plans, the acquisition of land, the laying of the cornerstone, and relinquishing " The Little Tin Church ". (*I. & I. Holding Corp.* v. *Gainsburg,* 276 N. Y. 427, 433.)

These acts and forbearances are sufficient to support the agreements and make them enforcible, whether the instruments be considered as bilateral or unilateral contracts. Additional support is found in the prop of promissory estoppel. (*I. & I. Holding Corp.* v. *Gainsburg, supra,* p. 434; *Matter of Taylor, supra,* p. 573.) The declaration " for fair dealing, honesty and equity " is peculiarly applicable here.

This situation is easily distinguishable from such cases as *Twenty-Third St. Baptist Church* v. *Cornell* (117 N. Y. 601) cited and leaned upon by the executor. There " the decedent did not request the corporation to build the new edifice, and the church did not promise that it would  *  *  *." Hence, consideration was deemed absent. But the court recognized the prevailing principle that consideration would be present if expenditures had proceeded " with the knowledge and assent of the subscribers; but here, before any expenditure was made, or any work was begun, Mrs. Weeks died. Her gift was unexecuted at her death and revoked by that event.  *  *  * The promise died when she died, and was merely a good intention which did not survive her." (P. 605.) Plainly, that case supplies no pattern for this case.

The other cases cited and relied upon by the executor as authorities for jettisoning this claim are equally inapposite. Many of them concern executory promises clearly " without consideration, and intended to operate as a gift after death  *  *  *." (*Holmes* v. *Roper,* 141 N. Y. 64, 66.) Here, however, one of the executor's grievances is that the chapel was not erected during the decedent's lifetime.

(4) The claimant is the real party in interest. It was organized to carry on the work performed by the center, and it is, in fact, carrying on such work. That the decedent knew of the incorporation and succession, and never objected, but, instead,

tacitly acquiesced, is patent. Her contributions were to the " Students' Social Center ", and there is no contention that the contributions were or will be diverted to other purposes. The work is the same, the personnel is the same, the object of the gifts is the same. Such change as there was had relation to form, not substance.

(5) Failure of consideration does not follow because the chapel has not been erected. As observed, the decedent was kept informed of the causes for the delay, she recognized the validity of the causes, and assented to the postponements. She did not complain of the delays. Indeed, the pledge of February, 1935, expressly stipulates that the chapel " shall be immediately erected " upon receipt of the $25,000. Since construction is conditioned on payment, it is difficult to perceive merit in the complaint that the chapel has not been erected whilst resistance to payment persists.

(6) The decedent made the 1928 subscription before anything was said about buying a site. It does not appear that either subscription was conditioned on the purchase of a site. Dean Beekman's testimony that he advised Mrs. de Brabant that the land had been leased instead of bought, stands unimpeached. The charge of misrepresentation is unsupported.

The executor argues that the chapel was to be a memorial, and, therefore, in perpetuity, which a lease, instead of a purchase, frustrates. Dean Beekman testified, however, that " the thought of the memorial came up afterwards, after the subscription. * * * She spoke of it being carried as a memorial but her chief interest was in the work itself and in giving the Chapel."

In sum, with knowledge of what was being done, the decedent made no complaint about anything; as far as this record shows, she approved. Consequently, the court would not be justified in finding dissatisfaction where the decedent found none. It was she who was to be satisfied, and the record indicates that she was. There was mutual trust, confidence and understanding.

Convinced that the claim is a valid and enforcible one, the claim is allowed.

Submit decree on notice directing the executor to pay it in the sum of $25,000, with interest as provided by section 480 of the Civil Practice Act.